Good morning, Justices. My name is Stephen Gistenson, and along with Wayne Creel, we represent the Metropolitan Water Reclamation District of Greater Chicago. And Mr. Gistenson, you'll be the only one making argument? That's correct. Okay. For Terra. Good morning, Your Honor. This is David Gussman, and with me is my partner, Jill Anderson, and we represent the NM Project Company, or the Project Company, as it's referred to in this case, and I will be the only one giving argument. Very good. Each side has 15 minutes, but we don't look at our watches in this division if things are moving along, so try not to repeat yourselves. We have read the briefs. We've seen the video, which is thank you very much for putting it in there, but we'd appreciate it if you could get to your strongest point first, and anytime you're ready, Mr. Gistenson. Thank you. May it please the Court, counsel. Justices, I'd ask to reserve five minutes of my time for rebuttal purposes. So you shall. This is an appeal from an order of adjudication of civil contempt by the Circuit Court of Cook County, Illinois, in the Chancery Division, Judge Kathleen Pantley presiding. There is a related appeal before this Court. It's number 110780. That appeal was filed recently in connection with the order from Judge Pantley awarding attorneys fees and costs to what we call the project company, which consists of the Appalese 664 North Michigan LLC and NM Project Company LLC. We refer to those two entities collectively as the project company. This Court has stayed that appeal pending the outcome of this appeal. Your Honors, the trial court's adjudication of indirect civil contempt is erroneous and should be reversed for several reasons. First, the district, the Metropolitan Water Reclamation District of Greater Chicago, which I'll refer to as the district, did not violate either of the prior orders that are the subject of the emergency verified petition for contempt. The first order is a preliminary injunction order that was entered on August 14, 2008. The second order is the order on the merits with the exception of damage claims that was entered on May 19, 2009. The district violated no provision of those orders. The orders, in essence, set forth particular conduct that the district was not to undertake to, as the project company claimed, interfere with the project company's ability to develop these three parcels at 664, 666, and 670 North Michigan Avenue. In the course of the preliminary injunction hearing and the testimony from that hearing, the evidence from that hearing has been incorporated into all of the subsequent hearings. In the course of that hearing, the circuit court made a specific finding in its August 14th order that the district has legitimate security concerns that relate to how that private alley between the district's property at 100 East Erie and the three parcels to the east, how that private alley is managed and controlled. Those securities relate to the fact that this particular building, which the district calls its main office building, or MOB, is the building that houses the district's publicly elected commissioners, the public hearing room in which the commissioners conduct their regular meetings and special meetings. The building also houses what's called the district's waterways control room, which is the control room from which all of the waterways throughout the Chicago metropolitan area are regulated and controlled by the Water Reclamation District. In this private alley, which is 18 feet wide and 95 feet long, dead-ending into the 670 parcel to the north and open to Erie Street on the south, this private alley has three access points to the district's main office building. One of those is an open entrance to a parking garage on the first floor, part of the first floor of the district building. The second one is a doorway that accesses the district's basement. And then third, and the final access point, is the emergency exit from the district's public hearing room that goes directly into the alley. And that's because directly on the other side of that brick wall is the public hearing room where the district conducts all of its public meetings. The court found that the district has legitimate security concerns controlling access to that private alley. In fact, the court said in its order, it's on page 810 of the appendix, that the court, while it orders the gate that was presently erected to be removed, the court has no quarrel with some gate that doesn't interfere with the full width of the alley, some gate, and the court said, due to the district's security concerns. The court went further. The court expressly recognized that the district has a right, the court said, a right to determine if an unidentified person that is found in the alley belongs in that alley. And what the court found, and I quote, I think the district does have a right to know who, that everybody is authorized to be there, meaning to be in the alley. The prior orders that were entered, both the August 2008 order and the May 2009 order, say nothing whatsoever as to any limitation on the district's ability to secure that alley. Those orders say nothing as to how the district is to determine who has a right to be in the alley and who doesn't have a right, or stated differently, who's authorized to be there. There's no prohibition in that order, or in either of those orders, telling the district it can't make sure, as the court said in its finding, that everybody who's in the alley is authorized to be there. The occasion that's the subject of the contempt proceeding, which occurred on October 13, 2009, is just such a situation.  We had a police officer, the district had a police officer at the 100 East Erie building at the security desk monitoring video cameras that show who is and who may be coming into the alley. The officer noticed that someone came in the alley, did not recognize that person. The person didn't look like someone who's typically in the alley, the construction site. So the officer was concerned that this person may not be authorized to be in the alley, and if so, that person may be trespassing. Does the Metropolitan Sanitation District have a police force or are they security officers? It has a police force, Judge. Are they recognized as such by statute? It is. It's a state-sponsored police force, a state-certified police force. Its officers go through the normal state certification process. They take an examination. They have firearms training. They have use of force training. They go through all the requirements of any other police officer that's certified by the state of Illinois. Your Honors, all the district was doing on October 13, 2009, was monitoring who was in the alley. When it found somebody, when Officer Phillips, Lanisha Phillips, who was the officer on duty at the desk, saw this person and didn't know who he was, she went out to investigate whether there were a trespass occurring. And that's all she did. And that's perfectly consistent with what Judge Pantley, the trial court, ordered in both August of 2008 and in May of 2009. At worst, at the very worst, we have two orders that are ambiguous or that need to be clarified. We have a circuit court judge that recognized that the district has a security interest that needs to be protected. A judge that recognized that the district has a right to know that someone in that alley is authorized to be there. And I might add, it's in the best interest of the project company as their principal testified. They only allow authorized people to be in that alley. It's in the best interest of the parties on both sides of that alley to make sure that the people in the alley are authorized to be there. At worst, at worst, it's an ambiguous order that needs clarification. Under either circumstance, the district didn't violate either of those two orders. The orders, in order to be the subject of a contempt proceeding, have to be clear, explicit, unambiguous. In this case, for the reasons that I've described, we don't have such an order. As to several of the other arguments that the project company has raised and that the circuit court relied on, again, the district violated no provision of the order. The district wasn't required in the order to circulate, in either order, to circulate those orders to all of its employees or all of its police force. It would be unexpected for the district to have to do that. We have a 15-page order from August of 2008, which is an order full of legal analysis. We have a 27-page order from May of 2009, which is full of legal analysis. It's hardly practical to issue those two orders to the district's police force and expect the police force to understand those orders. Instead, what the district affirmatively did is its chief of police notified all of its police officers during the normal roll call process that the district is to ensure that the project company and its contractors is in no way obstructed or impeded from entering into that alley. And the district's chief of police did that on the very day after the August 14, 2008 order was issued. Well, one reason that order was entered is because the district has been extremely litigious in this. I don't ask you to agree with me that your client is extremely litigious. But you've been in front of this panel a couple other times where people representing the district have. If they could possibly say no to anything, they say no. Even though it's clearly going to happen, there's an easement. We've just had that a couple years ago. If they can possibly be a stick in the mud, the district's going to cooperate extremely grudgingly. That's the history of this case. You have to live with the history of the case. We only see it when you're not playing nice. Of course, we're not out there every day ourselves. We only see it when there's a big fight. And we have to come to this court, you have to go to the lower court, to complain that one side or the other is not playing nice. Justice Quinn, I don't know what case other than this case you may be referring to. But in this case, the district has not been litigious in the sense of in any way abusing any process before the circuit court or before this court. What we have... How about the whole building? The idea that you had to remove a gate and put in a different gate? Well, Judge... I bet you wouldn't agree on what an easement is. I mean, that's... Well, Justice Quinn, in this case, the court agreed with the district that the project company's proposed use of that easement to benefit the corner property, the one at 664 North Michigan Avenue. It's called the Firewall Building. It's a landmark building. The project company intended to use that building to locate parking on that footprint, to access that parking through the district's alley into a parking garage. The project company intended to use that parcel with access to the district's alley to access a loading dock, to access exit points and entrance points to that parcel. The trial judge ruled that the project company was not entitled to do that. Justice Quinn, I respectfully submit to the court that the district hasn't been litigious in this case. What the district has attempted to do is to protect the rights it believes it has in that alley. The easement rights... Any dominant easement estate has the limited set of rights that are covered by those easements, and the subservient estate maintains all other rights. Hearing that, we don't have the easement case in front of us, but it has been. My point is, it has been in front of us. And, Joe, we don't see many easement cases. People, neighbors get along. They try to get along. Move on. Yes, Judge. I would only conclude my remarks on that subject by stating that the district was the one that filed the declaratory judgment action to determine what the rights of the parties were, and the court did find that certain aspects of the project company's intended use of the easement went beyond the easements and were impermissible. Justices, what the district did was not only not prohibited by either of the orders in this case, but the district's conduct itself was reasonable and cannot be the basis for finding that the district interfered with the project company's rights. I'll be brief because I'm running out of time, but in this case, what happened is, contrary to any suggestion of interference, the district, for the 14-month period after the preliminary injunction order was entered, had no incident whatsoever with anyone trying to access that alley, either by the project company or by any of its contractors. Fourteen months went by with no incident, and since the October 13, 2009 incident, there has been no further incident. That does not demonstrate the district's contempt of the court's previous orders. Rather than interfere, the district did, was cooperative, as you point out, Justice Quinn. The district did cooperate, not only with the project company's use of the alley, but this very police officer who was involved in this incident in October of 2009, she allowed people from the construction site to come into the district's building, which is a secure building at 100 East Erie. She allowed them to use the district's restroom. She allowed them to come in for drinks. This officer, after she completes her duty at the desk, she directs traffic in the afternoon right outside that alley because the project company is there with its construction. Rather than trying to interfere, the evidence demonstrates that the district cooperated and assisted by helping the project company's contractors with access to and from that site onto Erie Street during the rush hour period. There's no evidence here that the district in any way interfered, nor is there any type of motive or indication that it served any desire or interest of the district to interfere. This police officer, when she noticed this man walk into the alley, this police officer didn't just go out and kick the man out of the alley. The officer first went out, saw a flagger who was in front of the alley who works for the construction contractor at the site, and the officer first asked the flagger, do you know who that man is? And the flagger looked right down the alley. She had a clear line of view. The man walked right by the flagger, and she said, I don't know who it is. If the flagger had said, that's someone with the project company, that would have been the end of the investigation. But since the flagger didn't know who it was, the officer continued to investigate. When the officer investigated, all she did was walk to the corner of the alley and say, what are you doing down there? And instead of this man coming back and saying what he's doing, the man became aggressive. The man became combative. The fact that there is a difference in testimony between Bruce Schultz, the man who ultimately was identified as being in the alley, and the officer, as to what the officer initially said, does not defeat the district's appeal here, because Bruce Schultz's testimony on that subject is against the manifest way to the evidence. It's against the manifest way to the evidence, because the one individual who was there, of the three people there, who was as independent as possible under the circumstances, was Tracy Smith, the flagger. And Tracy Smith, who was standing 16 feet away from Officer Phillips when she went to the corner of the alley, said there's no doubt in her mind that what Officer Phillips said was, hey, what are you doing down there, as opposed to, get out of the alley immediately, which is what Mr. Schultz testified to. The significance of that is that Ms. Smith is an independent witness. Ms. Smith isn't even completely independent, because at the time of her arrest, she was one of the project company attorneys, and the project company was paying for her legal fees. But she was the closest to an independent witness we have, and the trial court ignored her testimony completely, did not consider her testimony whatsoever. We've read the briefs on all that. Could you comment on the order of March 5th? The recent order? Yeah. On page 15, the court will enter the following remedies. And you seem to say in your brief, they went too far, or the court went too far. That's correct. And my comment on those remedies is that they're overbroad, and they go beyond any reasonable remedy to compel compliance with the court's orders, which is, of course, the purpose of civil contempt. This is not criminal contempt. This is civil contempt. And the remedies are not to be punitive. They are to be such that they are intended to compel compliance. Is there any one of the six remedies that is impossible to comply with? I wouldn't say that any of them are impossible to comply with, but three of them constitute brand new injunctions that the court has issued prohibiting the district's police department from enforcing the law, usurping, basically, the statutory police powers that the state of Illinois has vested in the police, telling the police what they can and cannot do, but more importantly, preventing the police from protecting the main office building of the district, putting severe limitations on what the police can do, unless it first calls the Chicago Police Department and has the Chicago Police Department act. And that's not what the statute requires. The court's order doesn't accomplish coercing compliance with the prior orders, it punishes the district and it strips the district's police department. Judge Murphy, what the district suggested in the contempt proceeding, for the reasons that the district believed that the court orders didn't prevent it, but in fact recognized the district's right to enforce its security interests in the alley, was that the court clarify its order. That the court provide a method for the district to identify who is in the alley, whether they're authorized to be there. And I can't stress enough that for 14 months, there was never an issue. It was something the police officers were able to do without any problem. This one individual could not be identified. The district- Are you essentially trying to make two points this morning? One, that the two injunctions were ambiguous. And secondly, there's no provision in either injunction that prohibits the district from policing the alley and checking the identification of people who happen to be in the alley. Those are two points, yes. Those are two points you make? Absolutely. Okay. Absolutely. Why don't you save some time for reply? Thank you, Judge. Mr. Guestman. Good morning. May it please the Court and the Council. I have several points I'd like to make, and I would like to address some of the comments that were made by Mr. Gistenson. First comment I want to make is that if you review the order that's at issue here, the May 2009 order, it's clear and unambiguous that it prohibits an interference by the district with the project company's right to access to the alley. Mr. Gistenson suggests that that order is ambiguous, and it's clearly not. In fact, there are several provisions in the order, and your Honors have reviewed the facts, that are violated and are clearly violated, and it didn't take the trial court very long to come to that conclusion. The district wasn't joined from interfering with the use of the alley by the project company as a private alley for all lawful purposes, and the alley easements were declared by the trial court to permit the free and unimpaired access to the alley. And the court further said the project company is permitted free access to the alley. Now, counsel suggests that it's ambiguous, but you have to put this into context in which we are here and where that order was entered. The district has a long history of interfering with the project company's use of the alley. That history was the subject of a preliminary injunction hearing, where the court made it very clear that the district was not allowed to interfere with the project company's use of that alley. So the district would include any police officer of the district? The district includes all agents of the district, any police officer of the district. Yes, your Honor. And where does it specifically say that? It does not. It doesn't specifically say it. Well, if it doesn't say it, shouldn't it be specific so that your officer would know or the district would know that a police officer or they cannot go back and challenge someone? Justice Murphy, the conduct of the police officers was in part subject to the preliminary injunction hearing in August, and the court noted that the police officers had been accosting the project company, and it was the very type of behavior in her August 2008 preliminary injunction hearing that she found violated the easements. And that's one of the, so the district should be not surprised at all that the order should apply to all of its employees, including its police force, which are agents. I'm just asking somebody for their identification and pair access. Well... If I work in a building where I have to show identification, I've worked here 15, almost 15 years, and I better show ID or they won't let me in. Right. There's nothing that, well, there's a couple of differences between that building and the alley. First of all, that alley is open. There's no sign that says no trespassing. Anyone can walk in. Mr. Schultz, was he familiar with what that alley's purpose was, that he was next door to the Metropolitan Sanitary District and there were policemen hanging around there? He was familiar with the alley runner, of course. He walked, his office was kitty corner from the project site, and he walked into the alley, as you've seen on the video, and to view his construction site. Nothing inappropriate or wrong with that. When he was asked for his identification, he gave it. He said... Well, what happened before he gave it? Isn't that where the case turns? He asked for identification, he immediately said, oh, I'm Bruce Schultz. Let me show you my identification. Actually, your honor, the evidence is that very close to what you just said. When he walked into the alley, as the video will show, he heard the police officer at the front of the alley. It's disputed as to whether she told him to get out of the alley, but he heard her and the court found credible, he heard her say, get out of the alley. He started walking towards the entrance of the alley to leave. She approached him. He said, my name is Bruce Schultz. I am the owner or part owner of that property, and pointed to the property, and thereby identified himself. She came up to him and said, in effect, that's not enough. I want to see an ID. There's nothing in the law that requires anyone to carry an ID with them in this country. There's nothing in the law that requires you carry a driver's license when you're walking on the streets. But how does that impair his access to reach into his pocket and pull out his identification? At that moment, it didn't impair his access, your honor. It's when she admits that she stopped him at that moment. Once he said, I'm not going to give you the driver's license and tried to leave, she impaired his egress from the alley. After he refused to give his identification and show his identification. After he refused to show the identification, your honor, absolutely. So is it also your position it was unreasonable for the officer to ask for his identification? No, it's not unreasonable to ask anything, your honor. But that's the test that courts use, whether or not things are reasonable, right? Since it's not specifically set out in the order that she can't check for identification. Neither order has ever said that they're not entitled to ask for  So it's ambiguous? No, your honor. Why is it not ambiguous? It's not ambiguous because it says they can't impair his ability to come in and out of the alley, to use the alley. How do they know who he was? Well, there's a variety of ways they could have known, your honor. But he should have had a badge on, maybe? Well, no. I mean, as the court found, he could have been a variety of people. He could have been a union representative. He could have been a construction representative. People from the project company have been coming in and out of the alley for the last year and a half unimpeded. The fact that Mr. Schultz walked into the alley with a business suit on in broad daylight does not give her a reasonable suspicion, which is a test that he's committing a crime. Just as if you or I were walking into the alley. There's no reason. It doesn't really apply to this case, but how do terrorists dress these days? Pardon me? How does a terrorist dress? Well, there's- You think they come in dressed as a pacific? That's a good question. They don't necessarily come in with particular clothes, but there's nothing in the award robe of Mr. Schultz that day that would indicate he was a terrorist, or give any reason to suspicion. Well, he wasn't, first, your honor, when he walked in the alley, he wasn't looking at the district's property. He was looking at his own property. He had no bag with him. He had no guns with him. He had no- He was in the alley sometime before the officer approached him. He was in the, he walked into the alley before the officer approached him. And he was walking out of the alley when the officer approached him. She stopped him and refused to let him leave the alley at the moment that she said, I'm not satisfied with the identification you've given me. And therefore, I demand more. And I think the case law is very clear that that's not sufficient. You have to stop someone to seize them under the Fourth Amendment.  What crime could he have been committing? He couldn't have been committing a crime of criminal trespass. He couldn't have been up to public property or public land or land owned by the public. But police officers also have a right to engage in conversations with citizens. They do, and citizens have a right to walk away from them, unless there's a reasonable suspicion they're committing a crime. All of us have that right. And this alley's, I'm sorry. That's okay, go ahead. In some place in your briefs, you mentioned how safe this alley is. The alley has never been a site of a crime. Don't you think that's because there are cameras there and police officers in the building? Well, it's- I mean, I wouldn't go down to the 18th district and commit a crime. I think the alley, I'm not exactly sure why there's no history of criminal conduct, but it goes to the fact that if you're not in a high crime area, it goes to whether- Crime areas because it's patrolled. That's exactly what this police officer was doing? That's a question. Is it, was she patrolling the alley? Well, there's cameras. She looked at the cameras, said I better go out there and check it out. She looked at the camera because she didn't think he belonged. That was her testimony. And based on that alone, she detained him. There was no other reasonable basis to detain him, your honor. Is the reasonable, the law on, I mean, they're relying on what they claim to be a police exception. And I suggest that that action is why that alley is so safe. Not that it matters in this case. Well, I think the alley is safe for a variety of reasons. It's just off Michigan Avenue in Erie. It's a busy street. At this time of day, it was broad daylight. There's construction workers. I mean, it's not the kind of place at that time anyone would suspect anyone of committing a crime, and the only crime the officer suggests. But the FBI and all these things I read in the newspaper suggest be very, very careful of suspicious people. Now, they don't define that. This case is a businessman. Your honor, I don't think this case is about whether or not they can go out in the alley and patrol the alley. You're right. I don't think the case is about whether or not they can ask someone in the alley who they are. The question is whether or not they violated the injunction. Would you tell me specifically where you think they violated the injunction? I can tell you three ways that they violated the injunction. In her order. Yes, it's your honor, I can. In her order on page 24, she said the district is enjoined from interfering with the use of the alley by the project company for any, page 7. I mean as follows, 24. Page 26 of her order. 26, I'm sorry. I'm sorry, I missed one. 26. Paragraph 7, on the top of page, paragraph 20, page 26. I also would submit violated paragraph 5, but paragraph 7 is by far the clearest paragraph. District is enjoined, okay. I think she, they also, she also declared in paragraphs 3, 4, and 5 below that. Among other things, the project company is, has free access to the alley consistent with the terms of the easement. Now there are some differences, also I would submit, your honors, about this alley. This, this alley's already been before this court on an appeal. You're, this court's already found that, in almost the same words, that, that the project company has the right to free ingress and egress to this alley. The project company is a dominant easement holder of the alley. And Mr. Schultz is the principal of the project company. He's even referred to in the order of May 6th, of May of 2009. And so, with respect to the questions on violating the order, I don't, I, I think it's very clear that they violated specific provisions of an order. They also- Paragraph 7, that doesn't say that the district shall not, shall be prohibited from checking out who is in the alley. No, it's permitted, none of these paragraphs say they're not entitled to ask who's in the alley, but they are, they are not entitled to in, stop the project company. So when the project company walks in the alley and they say, I'm the project company, without more, they're not allowed to interfere with that project company's entrance. This case originally started with a gate, you'll recall from the prior appeal. They blocked the alley's use of the gate, and the court said in the preliminary injunction hearing, you can't use a gate to block it. She said you can't use police officers to block it. They have an equal right to be in this alley. Now their defense is, their defense is, besides the fact that they claim it's not clear. They have another defense, your honor, which is that the police, the proper use of police force, that's, that's their defense. And, and the trial court spent a lot of time, she looked at all the evidence, she, she looked at the law, and I think Judge Pantley got the law correct on, on the issue of, of reasonable suspicion. Well, what she's making here finds the fact that she went on that the fact that the police are armed makes it a non-level playing field. And she referred to the police, Metropolitan Sanctuary Police, as if they were from a totalitarian regime, right? That's true. Okay. She, she didn't, she, she said, actually, I think the totalitarian regime comment dealt with the issue that in this country, you can't, people are not required to walk around with identification. That issue's come up recently in Arizona. You're not in, you're not required to walk around with identification. Unless you have reasonable suspicion, as a police officer, that someone is committing a crime, you can't detain them. They detained Mr. Schultz in the alley. Repeatedly detained him in the alley. Without reasonable cause or suspicion that he was committing a crime. Detaining someone just because they won't give you a driver's license should be insufficient, is insufficient under the law. Well, it, it may be an efficient, insufficient under the law if, if the stop results in some evidence against that person. You could file a motion to quash arrest, motion to suppress evidence, if you were charged with a crime, if they recovered something from you. Was anything at all recovered from Mr. Schultz? My recollection, your honor, is when they, after they had put him in an arm lock, and he agreed out in the street, and held him for a minute or two. He, they, he. It doesn't look like a minute or two. Actually, the testimony from the officer is a minute or two. Okay. She testified to that, and it's in the record. I didn't make it up. I'm not, I'm not accused of making anything up. No, I know. Having looked at the video you supplied. You know, it's, it's, it's, she said a minute or two. I'm sure to Mr. Schultz, it seemed like five or ten. Looking at the video, it appeared to be a couple of seconds. So, that's why I bring it up. The officer said a minute or two in the, in transcript. I, I don't know, but it was sufficient time that he finally said, okay, I will give you my driver's license. Right. He gave, he gave her the driver's license. They did nothing with it. They let him go. They let, they let him go. Is it safe to say that it'd be reasonable to believe that when she said, show me your identification, he produced his driver's license, she would have said, thank you or nothing, and walked away? It's unclear what, what would have happened at that point in time. Had he, had he done what she asked him to do, it's unclear that she would still have wrestled him, even though he showed his identification? Well, at that moment, if you look in the video, you can see she appeared very, fairly angry. This is from 100 feet away, and these are fairly, I don't know how expensive they are, but I can't make anybody's facial features on this. I think if you look at the, one of the videos, you'll see a shot of her as she's approaching Mr. Schultz, and you can see her face is, is fairly angry. In any event, the court found her to be angry, and not Mr. Schultz, and that was after hearing nine days of testimony. How do you get money, how do you get, how is it actionable when somebody's angry? You know, I'm, I'm kind of well known up here for getting angry all the time, and it doesn't mean people can sue me, and I hope. Well, it, it, this is, this is a situation, Your Honor, where we're simply asking, we asked the trial court, and we're asking this court to affirm a finding that they can't do, they can't engage in this type of conduct in the alley with people from the project company. But you've conceded, and correctly so, that it is not unreasonable for metropolitan sanitary police officers to ask anybody for identification in that alley, and that's what they did here, so that's not unreasonable. And, and he, maybe we're playing with the word identification. He identified himself to her. He didn't say who he was. He identified himself. That's all he has to do. He answered the question. I'm Bruce Schultz, I'm with the project company. Had they given this order to the police officer, had they educated the police force about Judge Pantley's order, that should have been enough for her to understand. He says he's with the project company. Without more, there's no basis to detain him, to interfere. The order does not direct the police not to check with the identification, or for identification. It does not specifically prohibit them from doing that, correct? There's the order- No, I just want you to answer. Does the order specifically say you cannot check identification? It does not specifically say that, your honor. The honor, the order says you cannot interfere with the, their legitimate use of the alley by ingress or egress. And in order not to interfere, they first of all have to know who you are, right? Well, your honor- That's a condition proceeding. I need to know who you are, and then I will not interfere. Well, that would go to suggesting that you'd have to have a badge or identification every time you walked into your alley. You know that's a good point. Wouldn't that be helpful? I don't think so, and I don't think it's necessary in this case, your honor, because- But wouldn't that solve all the problems? If people were wearing badges, or hard hats, or some kind of an identification that indicated that they were connected to the project, wouldn't that help? Well, with the hard hat situation, your honor, apparently she had no problem with that. She let people walk in and out of the alley if you had a hard hat. So if Mr. Schultz had a hard hat on, he would have been- Because it was clear they were with the project. Right, but it's also a situation where someone who's wearing a business suit, who's developing the property, walks in the alley. It's not surprising that that person would be with the project company. No, it's not, but I'm simply asking you, is it unreasonable to say that it would help if he had some identification, so that he could move freely up and down that driveway? I don't think that that would be necessary, your honor, under the law of easement law, under the ruling- The question was, wouldn't that be reasonable? To require identification? I don't think it would be reasonable. Construction hat, like I see the foreman across the street from where I live wearing, or yellow tape. But you probably, if you look at it, you probably see some other folks out there, especially when it's below ground construction, where hard hats aren't required, and Mr. Schultz described that to the- It's not required. The question was, wouldn't it be reasonable? They have some sort of identification hanging around their neck, and all the construction projects I'm familiar with had an office. I don't think it would be- In fact, there's a sign across the street from here that says, report to office. I don't think, your honor, that it would be reasonable to require people with a project company, or agents of the project company, or the new people who are going to live in the building. I mean, this issue could come up again if it's limited to, and they're allowed to, and are required to use, put badges on everyone. Because the building's now up, your honor, people that are going to live in that building should not be required to put identification on in order to go in and out of the alley. When does this injunction expire? The injunction- Because you just mentioned residents. I did. What if one resident leaves and a new resident comes in? Right. That could happen 100 years from now, maybe 90. And that's why this injunction is a good injunction, your honor. Because it prohibits a district from going out into the alley, if they think there's a crime being committed. They are entitled, under their view of their powers, to use those powers. Now, we also take the position in our papers, and as an alternative way of affirming this, that they don't actually have police power. And that we address that in the briefs. But I think, your honor, one of the reasons John Spantley, who's lived with this case for four years, entered this injunction is she didn't want this conduct to occur, or conduct like this to occur in the future. This is a shared alley. It's a shared property. And to require the project company or its agents to wear badges, or residents to wear badges, so that they are identified would be unreasonable. This injunction is to ask for compliance. Compliance with their property rights, as you say. And say 30 years from now, the building will be complete. We hope it'll be completed sooner, your honor. And then you're saying, no matter what, every time there's a new resident that comes in, the district must inform them. How does a district, you're going to set up a system where the district knows that someone looked at the property, or actually signs a lease, or buys it? I think the point here, your honor, is their police are entitled to patrol the alley, look around, do the things that police officers always do. But they're not entitled to accost people, interfere with their use of the alley. Unless they have a reasonable basis to believe they're committing a crime. You're saying, basically, the injunction could go on and on. Well, I think that's actually a point I did want to address. There are ways that they, you know, junctions are tailored, and I think this junction is carefully tailored, to provide the, for two things, really. She says, educate your people about the law, the Fourth Amendment. How would you do that? I'm a district man. As courts have held, and we've cited it, you have training sessions. Do you have to devise it, the telelog, the janitors, the press, maybe? I think, first of all, I think at minimum, you would ask your police chief to read the order. You would sit down with them. This May order was entered, the injunction order was entered. It was ignored. There is no evidence. This is teaching them the law. Do you see any officers, whether or not they're a lawyer, can still interpret all this? I think that one, there's- I was just going to talk about the Fourth Amendment. I take it that not many of them even read the Fourth Amendment. Well, we know that nobody got the order from the district and the police department. No one received it before it was, after it was entered. This officer, you're saying, was never cooperative? I'm sorry? The co-officer, you're talking about. I thought we were talking about the order. No, I changed it. I went to the officer. The officer seems to have cooperated every time she was there. She let the workers go and come, let them use the washrooms, give them water, etc., etc., etc. So if she did that, is this an isolated event between someone who's clearly a police officer in uniform, in fact, with a gun, and one individual who goes back and doesn't quite feel he has to identify himself? Well, actually, Your Honor, she, they paint her in that light. But the day before, when she first met the flagger who started on the job the day before, she had an altercation with the flagger. And that's what the flagger testified to. I missed that. It's in our, it's in our brief. She had, she was described by the flagger as angry, at least angry. And she used a couple of other words. And that touches another point. She says, and the district says, they were to rely on the flagger by saying she didn't know who Bruce Schultz was. She knew the flagger had just been hired. She was an entry-level flagger on a projection site. It's not reasonable to rely on a flagger of that type to say whether or not she knew the boss, the owner of the, of the, of the whole facility. Your Honor, bring your remarks to a close. Wrap it up. Yeah, I, I, I will. I'm going to, I'm going to address the, the remedies, Your Honor. And I'm also going to, well, I will, I will address this. I think the remedies are carefully tailored. They're fairly simple to comply with. And as far as we know, the district hasn't yet done it. The keys are in their hands to comply with it, if they, to show that they've educated their police force. The remedies that are, are directed at, at the district, Your Honor, I think that all they're saying is follow the law. And I think when you review the law, you'll, as Judge Pantley carefully did, you'll see all she's, she's not, nowhere in there in her injunction does she say you cannot, you cannot ask people questions. No one in there does she say you cannot patrol the alley and you cannot ask for identification. She just says you can't seize them, which is a critical, critical distinction under the law. There's a difference between asking questions and seizing them. And Mr. Schultz was seized repeatedly in that alley in violation of the injunction and in violation of the due process, violation of the Fourth Amendment. If this was a Chicago police officer, and they claim they're the same, they're under the same set of laws. And people don't, aren't entitled to be seized in this country and shouldn't be seized just because a police officer thinks they don't belong. That's not the law, and I hope that's not the law that this court would condone. I would finally, in closing, say that, of course, the test here is against the manifest weight of the evidence. Judge Pantley entered the preliminary injunction, and assessing the credibility of these witnesses. She spent nine, I think it was nine trial days, sifting through all the evidence, reading the evidence, and looking at the video. And I think her opinion should be affirmed, not only because it's not against the manifest way of the evidence, but it's clearly supported by the evidence and the law. Thank you. You're welcome. Briefly, Mr. Kistensen, and only in reply. Justice, as a recurring theme, both in the trial court and now before your honors, is that the district accosted people in the alley. The sole basis for that conclusion is that Lanisha Phillips, a police officer, was wearing a .40 caliber Glock with her uniform on the day that she had this incident with Bruce Schultz. That is the sole evidence that the district in any way, quote, accosted anyone from the project company. Judge- And she seemed to be protecting that Glock. She was. And she turned away, so he was made harder for him if he was going to reach for it. That's exactly right. Officer Phillips testified based on her training, and in fact, in closing argument before the circuit court, the circuit court said, everybody knows that when a police officer is confronted, the police officer steps back to protect her weapon. There was no accosting. The only evidence before this court or the circuit court is that the police officers wear a gun. And more interestingly, when Judge Pantley in her March 5th order last year, the contempt order, she based her order on having previously noted in her preliminary injunction ruling that the district police so-called accosted people from the project company. Judge Pantley based her contempt order on something that happened before she even issued her preliminary injunction order in August of 2008. And again, there was no evidence. What happened in 2008 before the contempt hearing, the project company claimed there was somebody accosting them. I had a witness in the courtroom prepared to testify that they simply asked the person why they were there. And once they said we're with the project company, they let them in the alley. Again, a police officer wearing a service weapon is not accosting anybody. Second thing I'd like to address is the question of reasonable suspicion. The question of whether Officer Phillips acted appropriately is something that has to be considered under all the circumstances before the court. And what she saw is a man walk into an alley that had no access to anything except for the district's building. You can see in the video, there's a construction fence that seals off the project site. There's no access to the project site. This man, when Officer Phillips got out to the alley, was not in plain view. He was standing behind several trash dumpsters. She didn't know what he was doing. Therefore, she asked him what he was doing. And that's when he became confrontational. And that's when Officer Phillips had implemented an investigatory stop and asked the man for his identification. That's reasonable under the circumstances. What Judge Pantley, what the circuit court did here that's erroneous is the court applied an improper standard. Using the court's language, if somebody that gets to walk around with a loaded Glock and has all sorts of power, that person is subject to real strict scrutiny. The court held that the court should dissect what officers do because we give them guns. The court held if they're not up to standards, then they shouldn't be police officers. Instead of applying the standard required under the law that says there must be a minimal level of objective justification, a minimum level, far short of probable cause, far short of a preponderance of the evidence, if there's that minimum level, then an investigatory stop under Illinois law and under Terry is proper. And that's what this officer did. She saw a man. She didn't know what he was doing. He didn't look like he belonged. The case law instructs us that that's exactly what a police officer is to consider. The police officer is familiar with the location. She's supposed to take into account what the characteristics of the location were. Again, no access to the project company, only access to the district's property. The man wasn't dressed as though he were a construction worker. What was he doing there? And another point that bears on this is that going back to this gate, the district only put up this gate because Tara, the owner of those three parcels prior to April 30, 2008, requested the gate. And it requested the gate, I believe it was Justice Quinn who asked the question about crime. Tara requested the gate because Mayor Daley's wife, who was on the board of the Tara Foundation, was leading a board meeting one evening. And she was approached by somebody coming out of the dark alley. If that's not on the record. It is on the record, Judge. It has nothing to do with what's going on. Wrap it up. One of the justices asked about security. And that's one example. That's why the gate was put there. I'll conclude with this problem with the circuit court's order. The court recognized that the district has a right to know that everybody is authorized to be in the alley. The court said that. That's one of the findings she made. It's in the record in volume 18 at page 655. How does one reconcile that with telling the district it cannot approach people to find out why they're in the alley? How can a police officer be prevented from finding that out? That is all that happened here. The only reason the incident escalated from there on is because Mr. Schultz, who we found out is the person, rather than cooperate, became angry, was yelling, was waving his hand, and the officer felt it was reasonable to take further steps. And under the circumstances, the district submits that that was reasonable. Thank you, Justice. This case will be taken under advisement. This court will be adjourned.